MELROSE ASSOCIATES, L.P., a Rhode Island Limited Partnership, Plaintiff,

v.

UNITED STATES, Defendant.

No. 97–415C.

United States Court of Federal Claims.

Sept. 30, 1999.

Richard A. Boren, Visconti & Boren, Ltd., Providence, Rhode Island, attorney of record for the plaintiff.

John E. Kosloske, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were David M. Cohen, Director, Civil

Division, and David W. Ogden, Acting Assistant Attorney General, attorneys of record for the defendant. William Poole, Office of Assistant General Counsel for New England Region, Massachusetts State Office, Department of Housing and Urban Development, Boston, Massachusetts, of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The plaintiff, Melrose Associates, L.P.,[1] is the owner of eleven apartment buildings containing 42 residential units located in Providence, Rhode Island, and known as the Melrose Apartments. The United States, the defendant, and Melrose entered into a "Housing Assistance Payments Contract" (HAP contract) with respect to Melrose apartments on August 12, 1982, pursuant to a Department of Housing and Urban Development (HUD) program which provides mortgage insurance for developers of low-income and moderate-income housing under section 221(d)(4) of the National Housing Act, codified at 12 U.S.C. § 17151(d)(4) (1994). The HAP contract between Melrose Associates and HUD specified a monthly rent for each of the different types of apartments, which is referred to as the "contract rent." 24 C.F.R. § 881.201 (1996). The HAP contract, at section 2.7(b), also provided for the adjustment of contract rents through the use of an Annual Adjustment Factor.

Elizabeth Bogosian, on behalf of the plaintiff, and Luisa Osborne, a HUD employee, purportedly acting on behalf of the defendant, executed two amendments to the Melrose Associates HAP contract providing for a Conversion from an Annual Adjustment Factor contract rent based calculation to a Budget Based Formula. On or about October 31, 1996, Melrose Associates caused to be delivered to the HUD Rhode Island State Field Office two documents, signed by Elizabeth Bogosian, one entitled "Amendment to Housing Assistance Payments Contract" and the other entitled "Regulatory Agreement Amendment." In the documents, the plaintiff was to be awarded an increased Budget Based contract rent. As a result of direction from Washington, however, by letter dated May 20, 1997 to Melrose Associates, HUD's Rhode Island State Director of Multifamily Housing rejected the Budget Based Conversion. Thereafter, the HUD Rhode Island State Field Office reduced the Melrose HAP contract rents to contract rent levels that had existed immediately prior to September 1, 1996, employing the Annual Adjustment Factor methodology. For the period from September 1, 1996, through May 31, 1997, the United States made housing assistance payments to the plaintiff in the total amount of $999,495.00, using the Budget–Based rent adjustment method. For the month of June, 1997, the plaintiff received no payments, and for July and August, 1997, the plaintiff received a total of $37,850.00.

The amended complaint filed in this court by plaintiff contained two breach of contract counts based upon the Melrose Associates' HAP contract between plaintiff and HUD and upon an implied-in-fact contract theory. Defendant rejected the claims included in the plaintiff's amended complaint, and asserted a counterclaim in the amount of $742,367.50, reflecting a claim for return of the difference between the higher, Budget Based amounts paid to Melrose Associates as a result of the unauthorized Conversion and the applicable HAP contract Annual Adjustment contract rent rate.

In an earlier opinion issued by this court in the above captioned case, the defendant's motion for summary judgment was granted, dismissing plaintiff's claim, and the plaintiff's motion for partial summary judgment was denied. The defendant's motion for summary judgment on its counterclaim was granted in part regarding a denial of the plaintiff's affirmative defenses of waiver, "un-

---

1. Melrose Associates, L.P., is a limited partnership formed on August 2, 1982 and existing pursuant to the laws of Rhode Island. As of that date, Melrose had three general partners: James Woloohojian; Elizabeth Bogosian; and Harry Woloohojian. Elizabeth Bogosian is the sister of James Woloohojian and Harry Woloohojian. James Woloohojian, Elizabeth Bogosian, and Harry Woloohojian were the general partners of Melrose from its inception until the death of Harry Woloohojian on September 8, 1989. Since that date, James Woloohojian and Elizabeth Bogosian have been the general partners of Melrose.

clean hands," and laches. The facts which led the plaintiff to file a complaint in this court were fully detailed in this court's earlier opinion, dated February 6, 1999. *Melrose v. United States*, 43 Fed.Cl. 124 (1999). The Facts as found by the court in that earlier opinion, therefore, are incorporated into the court's opinion issued today and need not be repeated here. Today's opinion supplements the court's earlier opinion and addresses the only two remaining issues in the case: (1) whether the doctrine of equitable estoppel prevents the government from asserting a counterclaim to recoup funds paid to Melrose under the November 1996 HAP contract rent adjustment approved without authority by Ms. Osborne; and if not, (2) the appropriate amount of damages to be returned to the government by the plaintiff pursuant to defendant's counterclaim.

## DISCUSSION

 Melrose seeks to invoke the doctrine of equitable estoppel as a bar to the government's recovery on defendant's counterclaim for repayment of the rent subsidies paid to Melrose under the HAP contract utilizing the Budget Based rent formula. The doctrine of equitable estoppel is a judicial remedy invoked to avoid injustice, by which a party may be precluded, by its own act or omission, from asserting a right to which it otherwise would have been entitled. *See Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), *reh'g denied*, 497 U.S. 1046, 111 S.Ct. 5, 111 L.Ed.2d 821 (1990). The traditional elements for asserting estoppel against the government in the context of a contract dispute were: "(1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury." *JANA, Inc. v. United States*, 936 F.2d 1265, 1270 (Fed.Cir.1991), *cert. denied*, 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992) (citing *American Electronic Laboratories, Inc., v. United States*, 774 F.2d 1110, 1113 (Fed.Cir.

1985); *Emeco Indus., Inc. v. United States*, 202 Ct.Cl. 1006, 485 F.2d 652, 657 (1973)). To claim estoppel, a party must have relied on an "adversary's conduct 'in such a manner as to change his position for the worse' and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *See Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. at 59, 104 S.Ct. 2218 (quoting 3 J. Pomeroy, *Equity Jurisprudence* § 805, at 192 (S. Symons ed.1941)).

In both *Office of Personnel Management v. Richmond*, 496 U.S. 414, 421, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) and *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. at 60, 104 S.Ct. 2218, however, the United States Supreme Court left open a narrow possibility that under limited circumstances estoppel might be appropriate against the government. Although the Court in *Heckler* wrote that the government "may not be estopped on the same terms as any other litigant," *id.* at 60, 104 S.Ct. 2218, the Supreme Court refused to hold that estoppel might not be used when justified by the "countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Id.* at 61, 104 S.Ct. 2218. In *Office of Personnel Management v. Richmond*, the Supreme Court further discussed the possibility:

Our opinions have continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of "affirmative misconduct" might give rise to estoppel against the government. *See INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21 38 L.Ed.2d 7 (1973) (per curiam) ("While the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy*, 366 U.S. 308, 314, 315, 81 S.Ct. 1336, 1340, 1341, 6 L.Ed.2d 313 (1961), no conduct of the sort there adverted to was involved here"); *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (per curiam) (denying an estoppel claim for So-

cial Security benefits on the authority of *Merrill,* supra, but observing that the Court "has never decided what type of conduct by a Government employee will estop the Government from insisting upon compliance with valid regulations governing the distribution of welfare benefits"); *INS v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (per curiam) ("This case does not require us to reach the question we reserved in *Hibi,* whether affirmative misconduct in a particular case would estop the Government from enforcing the immigration laws"); *Heckler v. Community Health Services,* 467 U.S. at 60, 104 S.Ct. at 2224 ("We have left the issue open in the past, and do so again today.")[2]

*Office of Personnel Management v. Richmond,* 496 U.S. at 421–22, 110 S.Ct. 2465.

Plaintiff contends that the instant situation is appropriate for an exception to the general rule. Plaintiff alleges that (1) Ms. Osborne's failure to rescind the Budget Based Conversion or to notify Melrose of her lack of authority until four months after she learned of the problem, despite communications with Melrose during that time period, constituted "affirmative misconduct"; (2) plaintiff was ignorant of the true facts; (3) plaintiff relied on the conversion agreement with Ms. Osborne and that such reliance was reasonable; and (4) Melrose was placed in a significantly worse situation than would have been the case had it never received the additional rent subsidy funds.

■ Under the *Heckler* test and subsequent definitions of the elements of estop-

pel, without affirmative misconduct on the part of the government, there can be no equitable estoppel against the government. *See Hanson v. Office of Personnel Management,* 833 F.2d 1568, 1569 (Fed.Cir. 1987). The specific definition of affirmative misconduct sufficient to meet the rigorous Supreme Court standards, however, has varied among the circuits. *See e.g., United States v. Lancaster,* 898 F.Supp. 320, 323 (E.D.N.C.1995) (holding that "to be considered affirmative misconduct sufficient to estop the government, an individual's actions must go beyond innocent or negligent misrepresentations." (citations omitted)); *United States v. Marine Shale Processors,* 81 F.3d 1329, 1350 (5th Cir. 1996) (holding that to constitute affirmative misconduct, "at a minimum the official must intentionally or recklessly mislead the estoppel claimant."); *Akbarin v. Immigration and Naturalization Service,* 669 F.2d 839, 843 (1st Cir.1982) (noting previous differing and unproductive efforts to define misconduct and offering a somewhat different test, in an immigration case, that estoppel should be based on "two principal inquiries: whether the Government's action was error, and, if the complaining party reacted to the error, whether the action was intended to or could reasonably have been intended to induce reliance").

■ Although the Supreme Court and other courts have left open the possibility of an exception in cases of affirmative misconduct by a government agent, thus far, they have done so only while rejecting, for a variety of reasons, each attempt at application of the estoppel theory in the particular case then

---

**2.** The court notes that the holding in *Office of Personnel Management v. Richmond* was construed narrowly by the Court of Appeals for the Federal Circuit so as to be "limited to claims of entitlement contrary to statutory appropriations." *Burnside–Ott Aviation Training Center, Inc. v. United States,* 985 F.2d 1574, 1581 (Fed. Cir.1993). In *JANA, Inc. v. United States,* 936 F.2d 1265 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992), the United States Court of Appeals for the Federal Circuit stated:

It is also not entirely clear whether the defense of estoppel is still available against the government in light of the Supreme Court's decision in *OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), which held that,

absent fraud by the government, estoppel could never be asserted against it in suits to compel the payment of money from the public treasury in contravention of eligibility requirements contained in an Act of Congress. Public monies are unquestionably involved here, although statutory eligibility requirements are not.

Although not necessarily in the case at bar, this court does not construe these decisions as forever negating the possibility of recognition by the Supreme Court of limited exceptions to the general rule barring the use of equitable estoppel against the government. *See also Westinghouse Electric Corp. v. United States,* 41 Fed.Cl. 229, 240 (1998).

before the court. *See, e.g., Heckler v. Community Health Services,* 467 U.S. at 66, 104 S.Ct. 2218 (holding that the detriment faced was not so severe or imposed in such an unfair way as to invoke the estoppel doctrine); *Office of Personnel Management v. Richmond,* 496 U.S. at 434, 110 S.Ct. 2465 (holding that the courts cannot estop the Constitution and, therefore, there can be no "estoppel by a claimant seeking public funds"); *Henry v. United States,* 870 F.2d 634, 637 (Fed.Cir.1989) (holding that the oral advice given by an IRS agent did not constitute affirmative misconduct because the element of reasonable reliance was absent); *Hanson v. Office of Personnel Management,* 833 F.2d at 1569 (holding that misrepresentations made by Office Personnel Management and Office of Workers Compensation Programs officials to a benefits recipient did not constitute affirmative misconduct because the officials acted in good faith on the basis of the then accepted reading of the statute).

This court considers a demanding definition of affirmative misconduct appropriate, in accord with the strong adherence by the courts, including the Supreme Court, to the general rule restricting application of the equitable estoppel doctrine against the government. Ms. Osborne's failure to confirm her authority in advance, her ignorance of the limitations on her authority and her inaction by not notifying the plaintiff once she was made aware of the possible limitations on her authority before she was instructed by senior HUD officials that the Budget Based formula would not be approved in the case of plaintiff's HAP contract are not to be condoned. It does not appear, however, that Ms. Osborne acted in bad faith or recklessly, with an intent to injure the plaintiff, or with knowledge of the true facts. Moreover, inaction by a government official has been found not to constitute affirmative misconduct. *See, e.g., Lehman v. United States,* 154 F.3d 1010, 1017 (9th Cir.1998), *cert. denied,* ——

U.S. ——, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). This court, therefore, is unconvinced by the plaintiff that the circumstances presented in the above captioned case justify an exception to the general rule severely restricting application of the estoppel principles against the government.

■ In addition, the plaintiff has failed to demonstrate reasonable reliance on the government's conduct. Such reasonable reliance by the party seeking to invoke the estoppel doctrine also must be present for a claim of equitable estoppel against the government to succeed. *See Henry v. United States,* 870 F.2d at 636 (citing *Heckler v. Community Health Services,* 467 U.S. at 59, 104 S.Ct. 2218). Reliance is reasonable only if "the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler v. Community Health Services,* 467 U.S. at 59, 104 S.Ct. 2218.

■ Melrose's reliance on Ms. Osborne's unauthorized actions does not meet the test of reasonableness. It is accepted that "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."[3] *Id.* at 63, 104 S.Ct. 2218; *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (citations omitted); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). The United States will not be "estopped by its agents who act beyond their authority or contrary to statute and regulations." *S.J. Amoroso Constr. Co. v. United States,* 12 F.3d 1072, 1075 (Fed.Cir.1993) (*citing Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 384, 68 S.Ct. 1; *Yosemite Park & Curry Co. v. United States,* 217 Ct.Cl. 360, 582 F.2d 552, 558 (1978); *Porter v. United States,* 204 Ct.Cl. 355, 496 F.2d 583, 590

---

**3.** Footnote 17 to the above quotation in the Supreme Court opinion states, in part, "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 384, 68 S.Ct. at 3 (citations omitted).

(1974)); *see also*, 28 Am.Jur.2d *Estoppel and Waiver* § 132 (1966). "One who purports to contract with the United States assumes the risk that the official with whom he deals is clothed with actual authority to enter the contract alleged." *Urban Data Systems, Inc. v. United States*, 699 F.2d 1147, 1154 (Fed.Cir.1983) (quoting *Haight v. United States*, 538 F.2d 346, 209 Ct.Cl. 698 (1976)). In its earlier opinion in this case, the court previously found that Ms. Osborne lacked the authority to enter into the Conversion Agreement with Melrose. *Melrose Associates v. United States*, 43 Fed.Cl. at 144–145.

■ As party to a contract, Melrose was responsible for ascertaining whether Ms. Osborne possessed the requisite authority to convert their HAP contract to a Budget Based rent formula. This is especially true in a case such as the one before the court in which the HUD had published regulations detailing that in HAP contracts, variance from the standard Annual Adjustment Factor rent computation methodology to Budget Based contract awards requires a waiver signed at the HUD Assistant Secretary level or above. This court, therefore, will not invoke the doctrine of estoppel to protect this plaintiff from the repercussions of its failure to act prudently.

A rigorous approach to determining at what level of officialdom a contract can be signed on behalf of the government is necessary due to the risks of inappropriately draining public resources. "It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. at 385, 68 S.Ct. 1. "The United States Government employs over 3 million civilian employees. Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States." *City of El Centro v. United States*, 922 F.2d at 820 (footnotes omitted).

### DAMAGES

In their briefs, both parties agree that if the government prevails on its counterclaim, the appropriate measure of the government's damages is the difference between the amount of the rent subsidy that Melrose was paid and the amount of the subsidy that Melrose would have received if the unauthorized Budget Based Conversion had not been used in the calculation of payments to the plaintiff. Two issues regarding the computations, however, are contested. The first issue is whether the period upon which to base the calculations should end with the government's rescission in May 1997 of the converted HAP contract or continue through the end of the original HAP agreement period in August 1997. The second question concerns Amendment No. 3 to the HAP contract by which $250,000.00 was added to the available contract funds. Plaintiff alleges that they are entitled to these funds and accordingly plaintiff's liability to the government should be decreased by this amount.

The defendant asserts that the calculation of the government's damages should be "the difference between the amount of section eight rent subsidy that Melrose was paid for the period September 1996—May 1997 and the amount of the subsidy that Melrose would have received if the unauthorized November 1996 rent increase had not been used to calculate the payment."[4] The court concludes, however, that failure to consider the payments made and owed in June, July and August, 1997 under the original HAP agreement would allow the government to collect from the plaintiff the excess funds paid to Melrose in the first nine months of the HAP contract while escaping liability to the plaintiff for the shortfalls in payments made in

---

4. For example, the difference between an Annual Adjustment Factor award and a Budget Based award for the period September 26, 1996 to August 3, 1997 would have been:

| Unit Type | Units | Annual Adjustment Rent Method | Budget–Based Rent Method |
|---|---|---|---|
| 1–BR | 12 | $619.00 | $2,735.00 |
| 2–BR | 8 | $677.00 | $2,988.00 |
| 3–BR | 14 | $744.00 | $3,285.00 |
| 1–BR | 1 | $612.00 | $2,704.00 |
| 2–BR | 5 | $706.00 | $3,116.00 |
| 1–BR | 2 | $619.00 | $2,735.00 |

the last three months of the still in existence original HAP agreement. This court finds that offsetting Melrose's liability to the government by the deficit in payments received by the plaintiff in the last three months of the original HAP contract most accurately places both parties in the position they would have been in, absent the unauthorized actions by Ms. Osborne.

The government made the following payments to Melrose for the period September 1, 1996 through August 31, 1997:

| | |
|---|---|
| 09/96 | $ 24,023.00 |
| 10/96 | $ 23,495.00 |
| 11/96 | $ 23,354.00 |
| 12/96 | $378,287.00 |
| 01/97 | $109,888.00 |
| 02/97 | $110,163.00 |
| 03/97 | $111,671.00 |
| 04/97 | $109,197.00 |
| 05/97 | $109,417.00 |
| 06/97[5] | $ 0.00 |
| 07/97[5] | $ 16,705.00 |
| 08/97[5] | $ 21,145.00 |
| **Total** | **$1,037,345.00** |

Melrose is responsible for repaying the difference between the total amount shown immediately above and the funds to which they were entitled. In calculating the amount Melrose would have been awarded under the original HAP contract, absent the unauthorized Budget Based Conversion, both parties have made three assumptions: (1) If the unauthorized Conversion and the related November 1996 rent increase for Melrose Apartments had not occurred, Melrose would have requested and received a rent increase effective on September 26, 1996 under the original HAP Agreement. (2) The apartments were fully occupied. (3) During this period, none of the tenants were responsible for any part of the HAP contract rent for his or her dwelling unit, so that the Government would have been obliged to pay Melrose a subsidy equal to 100 percent of the HAP contract rents.

Using these assumptions, the parties agree that the subsidy amount that the government would have paid to Melrose absent the unauthorized Budget Based Conversion for the period September 1–25, 1996 under the adjusted rate can be computed as follows:

### Annual Adjustment Rate

| Unit Type | Units | | Monthly Contract Rent | | |
|---|---|---|---|---|---|
| 1–BR | 12 | X | $617.00 | | $ 7,404.00 |
| 2–BR | 8 | X | $674.00 | | $ 5,392.00 |
| 3–BR | 14 | X | $741.00 | | $10,374.00 |
| 1–BR | 1 | X | $610.00 | | $ 610.00 |
| 2–BR | 5 | X | $703.00 | | $ 3,515.00 |
| 1–BR | 2 | X | $617.00 | | $ 1,234.00 |
| | | | | Total | $28,529.00 |
| | | $28,529.00 × 5/6 months = | | | $23,774.17 |

The anniversary date of the Melrose HAP contract is September 26 of each year. Under the method of adjusting contract rents set forth at 24 C.F.R. Part 888, Subpart B, concerning "Contract Rent Annual Adjustment Factors," "[t]he adjusted monthly amount of the Contract Rent of a dwelling unit shall be determined by multiplying the Contract Rent in effect on the anniversary date of the contract by the applicable Automatic Annual Adjustment Factor" published in the Federal Register. 24 C.F.R.

---

**5.** The sums paid during June, July, and August appear only in the plaintiff's supplemental memorandum filed on June 24, 1999. The other amounts are identified in both the plaintiff's and the defendant's filings.

§ 888.203(b) (1996). The parties both have assumed that on September, 26, 1996, there would have been an adjustment to the rate under the original contract, absent the Conversion. The amount that Melrose would have received for the period September 26, 1996 through May 31, 1997, under the original contract, assuming an annual rate increase, can be calculated as follows:

### Annual Adjustment Rate with Annual Regulatory Rate Increases

| Unit Type | Units | | Monthly Contract Rent | |
|---|---|---|---|---|
| 1–BR | 12 | X | $619.00 | $7,428.00 |
| 2–BR | 8 | X | $677.00 | $5,416.00 |
| 3–BR | 14 | X | $744.00 | $10,416.00 |
| 1–BR | 1 | X | $612.00 | $612.00 |
| 2–BR | 5 | X | $706.00 | $3,530.00 |
| 1–BR | 2 | X | $619.00 | $1,238.00 |
| | | | Total | $28,640.00 |

$$\$28,640.00 \times 11\ 5/6\ \text{months} = \$319,813.33$$

The total of these two periods (September 1–25, 1996 and September 26, 1996—August 31, 1997) and the amount which Melrose should have received, is $343,587.50. Melrose actually received $1,037,345.00 and, thus, is liable to the government for damages in the amount of $693,757.50 because the conversion was unauthorized and, therefore, void.

Plaintiff also alleges that the $250,000.00 added to the funds available under the contract set forth in HAP contract Amendment No. 3 should be considered funds to which the plaintiff was entitled and, thus, should be offset against funds plaintiff owes to the government. Plaintiff argues that the $250,-000.00 amount announced in Amendment No. 3 was not computed using a Budget Based rate and, thus, even if Ms. Osborne had no authority to convert to the Budget Based payment methodology, she had the authority to obligate the $250,000.00.

The government correctly points out that the amount set forth in Amendment No. 3 is a "maximum annual contract commitment" available to the government to make the monthly HAP payment. It does not represent funds to which the contractor is entitled. Over the life of the contract, Melrose was not to be paid a lump sum payment, but rather was to receive a subsidy equal to the difference between the rent each tenant pays and the applicable contract rent, on a monthly basis. A consideration of relevant regulations and a close reading of Amendment No. 3 gives no suggestion that Amendment No. 3 was intended as an immediate lump sum award of funds. 42 U.S.C. § 1437(c)(3)(A) (1994); 24 C.F.R. § 881.501(d)(1)(1996). Thus, the $250,000.00 should not be included in the calculation of damages due on the counterclaim.

### CONCLUSION

Although the result on the plaintiff is harsh, the principle that taxpayers are entitled to protection against unauthorized government actions and unauthorized expenditure of government funds must be affirmed. Therefore, the plaintiff's defense of equitable estoppel, is, hereby, **DENIED**. Based on the calculations discussed above, the defendant is awarded $693,757.50 on its counterclaim. Because there is no indication in the record that the plaintiff misused the funds pursuant to what it assumed was a lawful conversion, it is not clear to the court why HUD has not taken action on Melrose's HAP contract similar to what appears to have occurred regarding other projects, in which those projects were converted or not converted back to the Annual Adjustment Factor methodology, at the discretion of HUD officials.[6]

**IT IS SO ORDERED.**

---

6. According to the joint stipulations submitted by the parties, Melrose Apartments was not the